FILED

JAN 13 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LYDIA STRAPPINI,

                             Plaintiff,

       v.

DAVID SIDERAS, ALBINA SIDERAS,
and HOUSING AUTHORITY OF
PORLTAND, a nonprofit Oregon
corporation,

                        Defendants.

Civ. No. 08-1393-AC

FINDINGS AND
RECOMMENDATION

_____

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiff Lydia Strappini ("Strappini") has alleged claims against the Housing Authority of

Portland ("HAP"), and David and Albina Sideras (David hereinafter referred to as "Sideras" and

David and Albina collectively as "the Siderases") associated with a residential eviction and rental

FINDINGS AND RECOMMENDATION       1                             {KPR}

assistance vouchers. Specifically, Strappini alleges that she was discriminated against based on a disability under the Federal Housing Amendments Act, 42 U.S.C. 3601 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 *et seq.*; Oregon Revised Statutes ("ORS") 659A.145, prohibiting discrimination and retaliation in real property transactions; the Oregon Residential Landlord Tenant Act, ORS 90.385; and claims for defamation.

HAP and the Siderases move separately for summary judgment on all claims. HAP's motion should be denied in its entirety. The Siderases' motion for summary judgment should be granted as to the ADA claim, and the defamation claim as it relates to Albina Sideras. The remained of the Siderases' motion should be denied.

*Factual Background*

Strappini has been a recipient of rent assistance from the Housing Authority of Portland, "under the Section 8 Housing Choice Voucher Program" for many years. (HAP CSMF ¶ 2.) In 2003, Strappini filled out a HAP form entitled "Request for Care Attendant/Live-in-Aide," setting forth her wish to have a family member act as a live-in aide. (Vickers Reply Decl., Ex. E at 8.) On September 26, 2003, Strappini's adult son Ian Strappini ("Ian") filled out preliminary paperwork to become eligible to be added to a Section 8 lease. *Id.* at 9. An application to add an adult to Strappini's household was partially filled out, but subsequently cancelled, bearing the notation: "[tenant] will apply to add [live-in aide] when has provider." *Id.* at 10. In October 2003, Stephanie Anderson, M.D., Strappini's doctor, submitted a "Doctor Verification of Need for Subsidy Standard Exception" form to HAP, recommending that the agency allow Strappini a live-in aide to provide medical care associated with her seizure disorder. (Strappini Aff. ¶ 11; Ex. B at 1.) Strappini "was not aware of any specific process that [she] needed to follow with HAP apart from providing HAP

with the documents [her] physicians had completed in 2000[1] and 2003." (Strappini Aff. ¶ 13.) In fact, she believed that HAP would contact her if she needed to take further action. *Id.*

On April 9, 2004, Strappini entered into a lease agreement with Richard H. Harutunia ("Harutunia"), the then-owner of a two-bedroom apartment on Southwest 51st Avenue ("the rental property"). Under the terms of that lease and the requirements of the voucher program, Strappini was the single authorized occupant of the rental property. (HAP CSMF ¶ 3.) The agreement stated that the premises would house "no more than" one adult. (Smith Aff., Ex. 1 at 1.) Attached to that agreement was a "Tenancy Addendum, Section 8 Tenant-Based Assistance, Housing Choice Voucher Program." (Smith Aff., Ex. 2.) This document states: "The composition of the household must be approved by the PHA[2] . . . . Other persons may not be added to the household without prior written approval of the owner and the PHA." *Id.* at 1.

The rental property was purchased by the Siderases in February 2005. (HAP CSMF ¶ 5; Vickers Decl., Ex. C at 2.) The Siderases had difficulty with HAP early on when their failure to timely complete contract paperwork with HAP resulted in delayed rental payments from HAP. (Strappini Aff. ¶ 20.) On April 13, 2006, Strappini filed a lawsuit aginst the Siderases, alleging disability discrimination, violations of landlord-tenant law, breach of contract, and negligence. (Strappini Aff., Ex. F.) According to Strappini, prior to initiation of the lawsuit against them, the Siderases did not have a problem with Ian visiting her. (Strappini Aff. ¶ 24.) The parties reached a settlement of this dispute "in May or June 2007." (Pl. Resp. to Sideras CSMF ¶ 2.)

---

[1] Strappini's neurologist signed a form authorizing a service dog at her residence. (Strappini Aff. ¶ 10.)

[2] This is a document published by the U.S. Department of Housing and Development and refers generally to a public housing agency, i.e., PHA.

Beginning in August 2006, Strappini received a series of notices of non-payment of rent (entitled "Landlord's 72-Hour Notice of Non-Payment of Rent") from Sideras, the accuracy of which Strappini disputes. On August 8, 2006, David Sideras mailed a notice of non-payment of rent to Strappini, alleging that her rent, due on the first of the month, had not yet been paid, and demanding payment by August 16, 2006, on penalty of termination of the rental agreement. (Strappini Aff., Ex. H at 1.) The record contains an official copy of a money order for $200 from Strappini to the Siderases which appears to be dated August 3, 2006. *Id.* at 2. A letter, dated September 13, 2006, from David Sideras to Strappini states that her rental payment was sent on August 3, 2006, but only received on August 10, 2006, and, thus, a late payment fee was due, owing, and past due. (Strappini Aff., Ex. J.) On September 17, 2007, Sideras again mailed Strappini a notice of non-payment of rent. (Strappini Aff. Ex. M.) The record contains a money order, that appears to have been scanned or sent on August 31, 2007, for $177 to David and Albina Sideras. (Strappini Aff., Ex. N at 2.) Finally, on November 21, 2007, Sideras sent Strappini another notice of non-payment of rent, which stated: "Your monthly rental payment of $177 per month is now past due for the month of November, 2007." (Strappini Aff., Ex. U at 1.) It also noted that $2 in other charges was still owing. A postal money order shows, however, that Strappini paid the Siderases in the amount of $179 on November 2, 2007. (Strappini Aff., Ex. U at 2.)

Under the voucher program, a resident may be authorized to have a live-in aide. Strappini has never had a live-in aide, nor has Ian been authorized to act as one on her behalf. (HAP CSMF ¶ 11-12.) David Hohnstein ("Hohnstein"), a Fraud Inspector for HAP, described the reasonable accommodation process at deposition: "if anyone has need of an accommodation to perform the normal activities of the day, whatever that might be, we're allowed to go beyond our general policy

to accommodate that person, as long as it's signed by a doctor or other caregiver." (McCool Decl., Ex. B at 3.) Strappini testified that she had never had a "live-in aide" authorized to live in her apartment and that her son, Ian, had never been designated as such. (Vickers Decl., Ex. B at 2-3.) On December 28, 2007, Dr. David Sax signed a "Reasonable Accommodation Verification" on Strappini's behalf, stating that she required a live-in aide to help her manage her seizures and diabetes. (Strappini Aff. Ex. Z.)

In May 2007, Ian's building was being converted to condominiums and he had to move out. At this time, Ian moved some of his possessions, including a mattress, into his mother's house. (Vickers Decl., Ex. D at 2-3.) The mattress was placed in the extra bedroom and provided a place for a guest to sleep. (Vickers Decl., Ex. D at 3.) Strappini later replaced the mattress. *Id.* Ian was never screened by HAP or authorized to reside at the rental property. (HAP CSMF ¶ 8.) Strappini admits that she never received formal approval from HAP to have a live-in caregiver at her apartment. (Vickers Decl., Ex. B at 6.) In addition, Ian often left his car at Strappini's residence so that she could use it when he was not. Strappini "allowed Ian Strappini to leave his car at [her] apartment because [she] was entitled to a parking space[.]" (Strappini Aff. ¶ 37.)

On June 15, 2007, shortly after the parties reached a settlement of the lawsuit filed in Multnomah County Circuit Court, Strappini received a "Notice of Violation," issued by Sideras, which provided that Strappini was not authorized to sublet her apartment or have guests for an extended period of time. (HAP CSMF ¶ 6.) The notice accused Strappini of having "guests in residence" for approximately three to four weeks, HAP CSMF ¶ 6, but stated that she could remedy the violation by excluding those guests from her property. (Vickers Decl., Ex. B at 12.) In a letter dated June 20, 2007, Strappini responded that her son had stayed at her house in order to assist her

with "life threatening medical conditions[,]" and had not been there for the three to four weeks as alleged in the notice. Strappini also advised that a reasonable accommodation form would provide the information necessary to maintain the housing relationship. (Strappini Aff., Ex. L.)

Sideras subsequently contacted HAP to find out if Strappini had received permission to house an additional resident at her apartment and was told that she had not. (Smith Aff., Ex. 4 at 1.) Sideras told HAP "that he suspected [Strappini] had an unauthorized guest living with her at her apartment." (Sideras CSMF ¶ 17.) At deposition, Sideras testified: "I had heard from one of the other tenants that he was staying there. I saw his car there on various occasions, and then I saw him walk out. That is enough for me to issue a notice." (Smith Aff., Ex. 3 at 1.) He later stated that this was the extent of his personal knowledge of Ian's purported residence. (Smith Aff., Ex. 3 at 2.) He testified that he believed, but was not sure, that the lease agreement prohibited Strappini from "having a car parked in the same location for a long period of time[.]" *Id*. Sideras admitted that he never notified HAP about a form he received from Strappini which included a discussion about accommodating her disability. (McCool Decl., Ex. C at 4.)

HAP initiated an investigation after "receiv[ing] information that there may be an unauthorized guest at the property where [Strappini] was living." (McCool Decl., Ex. B at 4.) On September 24, 2007, Hohnstein reported to Sideras that Ian had been evicted from his own apartment in May 2007 and had recently changed his address to the post office box used by his mother. (McCool Decl., Ex. A at 1.) Hohnstein could only document Ian being in the unit "occasionally[,]" and requested additional documentation from Sideras. Sideras responded that a neighbor, Scott Sexton ("Sexton"), would "confirm that [Ian] has been there the whole time since the date of [Sideras's] earlier notice except for periods of three or four days at a time when they feel someone

[was] paying too close attention." *Id.* He also mentioned that he would "re-notice" Strappini for the violation.

Hohnstein testified that after he spoke with Sexton he "decided to rescind the investigation," because it was "going nowhere." (McCool Decl., Ex. B at 6.) Hohnstein also testified that he had neither official records documenting Ian's residence at the residential property, nor had he personally seen him there. (McCool Decl, Ex. B at 9.) Furthermore, Hohnstein stated that he told Sideras that he could not document a HAP violation based on Ian's residence at the subject property and that he never told Sideras that he needed to evict Strappini in order to be in compliance with HAP. (McCool Decl., Ex. B at 10-11.) Hohnstein ultimately concluded that Strappini had not committed fraud. (McCool Decl., Ex. B at 17.) Hohnstein also testified that he unsure if Strappini ever received a letter informing her of the requirement that she get a live-in aide approved. (McCool Decl., Ex. B at 18.)

On October 5, 2007, Strappini received a second Notice of Violation again citing unauthorized tenants and advising Strappini that her violation could be cured by gaining approval from HAP. (HAP CSMF ¶ 7.) On November 9, 2007, Mark L. Busch ("Busch"), the Siderases' attorney, sent a letter to Strappini alleging violations of the rental agreement. (Vickers Decl., Ex. A at 55.) In particular, the letter noted that the rental agreement authorized only one occupant and that the presence of her adult son was in violation of this provision. *Id.* The letter informed Strappini that she could cure the violation by "[p]ermanently remov[ing] the additional occupant from the premises," or receiving approval from HAP for the additional occupant. (Vickers Decl., Ex. A at 56.) The letter also indicates that, if the above-referenced problem was rectified, the tenancy would continue. That same day, Sideras sent a letter to Strappini stating that, on the advice

FINDINGS AND RECOMMENDATION        7        {KPR}

his attorney, he was returning Strappini's rent payment for November. (Strappini Aff. Ex. T.)

At this point, Strappini went to the HAP office in search of assistance with her rental situation. She stated: "After receiving the letters from Mr. Busch and from David and Albina Sideras, I went back to HAP and tried to talk with someone at HAP who could help me. I was thwarted and frustrated in my attempts to talk to someone at HAP who would help me with my disability and threat of eviction." (Strappini Aff. ¶ 53.) Strappini was informed that she could not see anyone on a walk-in basis, but would be assigned a case manager. Strappini was not seen by a case manager or otherwise assisted by HAP prior to her eviction. *Id.*

An entry in HAP's file on Strappini states, on November 26, 2007, "No Transfer please! Termination Proposed[.]" (Strappini Aff., Ex. X at 1.) Strappini became aware of the notations in her HAP file in November or December 2007. (Sideras CSMF ¶ 10, 11; Strappini Aff. ¶ 60.) On December 19, 2007, the file indicates that Sideras was evicting Strappini for having an unauthorized guest and that HAP would "wait and see what happens[.]" *Id.* Various entries bear the designation "fraud." Hohnstein testified that, as a fraud inspector, he used the term to track his entries, and not to indicate that fraudulent activity had in fact occurred. (Vickers Reply Decl., Ex. F at 2.) He also testified that no one outside of the agency had access to the documents in the file. *Id.*

On December 11, 2007, Strappini responded to Busch's letter and explained that, while her son did occasionally stay at the apartment to assist her with her medical conditions, he did not live there. She wrote that, in responding to the Siderases' notice of violation of September 15, 2007, she had included a copy of her reasonable accommodation form. She wrote: "When the Sideris' [sic] purchased this property in April 2004, I was and still am a tenant through HUD based section 8 program. As far as I know all the necessary paperwork for my tenancy was transferred to the new

FINDINGS AND RECOMMENDATION         8                              {KPR}

owners . . . [i]ncluding the HAP reasonable accommodations form." (Smith Aff., Ex. 11 at 1.) She

also stated that, despite timely rent payments on her part, Sideras had been issuing notices of non-

payment of rent and assessing late fees. *Id.* She asserted that the late payment of rent notices were

upsetting to her because she believed that she had fully complied with her rental obligations. Finally,

Strappini offered to furnish additional information about her son's presence at her apartment.

(Strappini Aff. Ex. V.)

    In January 2008, Sideras filed a "Residential Eviction Complaint" in Multnomah County

Circuit Court, seeking eviction based on "30-day notice with stated cause." (Smith Aff., Ex. 12.)

Strappini opposed the eviction on the basis that the eviction notice was invalid and asserted several

other defenses. She stated that she was seeking a temporary restraining order to prevent an unlawful

eviction resulting from Sideras's failure to accommodate her medical condition. Strappini further

alleged that Sideras had harassed and slandered her by accusing her of being non-compliant with the

rental agreement, as well as initiating a fraud investigation in conjunction with HAP. (Smith Aff.,

Ex. 13 at 3-6.) After a "forcible entry and detainer ("FED") trial," Strappini was evicted from the

property on or around January 21, 2008. (Sideras CSMF ¶ 5,6.) At that trial, Strappini argued that

"her eviction was the product of disability discrimination[,]" but "[t]he court rejected [Strappini's]

defense." (Sideras CSMF ¶ 8,9.)

    Since her eviction, Strappini has "had difficulty finding stable housing" because HAP, at one

time, recommended termination of her status as a recipient of HAP assistance and listed her as "no

transfer." (Strappini Aff. ¶ 66.) Strappini investigated "every affordable housing and subsidized

housing option," but was turned down by every landlord in HAP's 2008 Housing Portfolio after they

"contact[ed] HAP to determine [her] history and eligibility." (Strappini Aff. ¶ 69.) The landlords

FINDINGS AND RECOMMENDATION          9                          {KPR}

cited Strappini's "issues" with HAP and her previous landlord, as well as her eviction, as grounds to deny her tenancy. *Id.*

Since the eviction, however, Strappini has continued to receive assistance under the voucher program and continues to receive assistance at this time.[3] (HAP CSMF ¶ 15.) In the course of looking for a place to live after her eviction, HAP granted Strappini three extensions of time to find a suitable place to live. Strappini "found a suitable unit in October 2008 and continues to receive Section 8 assistance." (Ford-Avery Decl. ¶ 5.)

*Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

_____

[3] This was true as of the date of hearing and, to the court's knowledge, is still true.

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

### Discussion

I.   HAP's Motion for Summary Judgment

HAP moves for summary judgment on each of Strappini's claims. For claims arising under the Fair Housing Act, the Americans with Disabilities Act, and ORS 659A.145 ("the discrimination claims"), HAP claims that it is entitled to summary judgment because Strappini cannot establish that she was ever denied benefits under the voucher program. With regard to the defamation claim, HAP claims entitlement to summary judgment because Strappini cannot establish publication of a defamatory statement.

FINDINGS AND RECOMMENDATION        11                        {KPR}

A.    Discrimination Claims

Strappini alleges that HAP discriminated against her in the rental of housing in violation of

the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3601 *et seq.*  Section 3604(f)(1)

provides, in relevant part, that it is unlawful:

> To discriminate in the sale or rental, or to otherwise make unavailable or deny, a
> dwelling to any buyer or renter because of a handicap of –
> (A) that buyer or renter,
> (B) a person residing in or intending to reside in that dwelling after it is sold, rented,
> or made available; or
> (C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1).  Such discrimination may include "a refusal to make reasonable

accommodations in rules, policies, practices or services, when such accommodations may be

necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C.

§ 3604(f)(3)(B).

A prima facie case under the FHAA for failure to accommodate has four elements.  The

"plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FHAA; (2)

defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation

of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the

dwelling; and (4) defendants refused to make such accommodation." *Giebler v. M&B Associates*,

343 F.3d 1143, 1147 (9th Cir. 2003) (citing *United States v. California Mobile Home Management

Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997)).  HAP's sole argument in support of summary judgment

on this claim is that Strappini was never denied benefits and, therefore, no violation could have

occurred.

To establish a violation of the ADA under Title II, "a plaintiff must show: (1) he is a

'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. Cal. 1997) (internal citations omitted). Again, HAP's sole argument in support of its motion for summary judgment is that Strappini never suffered a denial of benefits and, thus, no violation occurred.

Oregon law prohibits discrimination against people with disabilities in transactions involving real property. In particular, the law prohibits a person from discriminating against another based on "a disability of a purchaser, a disability of an individual residing in or intending to reside in a dwelling after it is sold, rented or made available or a disability of any individual associated with a purchaser . . . ." OR. REV. STAT. 659A.145(2). This prohibition on discrimination extends to specific activities, including "[r]efusing to permit . . . reasonable modifications of existing premises occupied or to be occupied by the indiviudal if the modifications may be necessary to afford the individual full enjoyment of the premises[;]" and "[r]efusing to make reasonable accommodations in rules, policies, practices or services when the accommodations may be necessary to afford the individual with a disability equal opportunity to use and enjoy a dwelling." OR. REV. STAT. 659A.145(2)(f),(g). Again, HAP's sole argument in support of its motion for summary judgment is that Strappini never suffered a denial of benefits and, thus, no violation occurred.

HAP claims entitlement to summary judgment on this claim because Strappini was never denied benefits. HAP argues that, where a plaintiff does not suffer an actual denial of benefits, the plaintiff cannot state a disability discrimination claim under the FHAA, the ADA, or Oregon law.

FINDINGS AND RECOMMENDATION        13                            {KPR}

In *Adam v. Linn-Benton Housing Authority*, 147 F. Supp. 2d 1044 (D. Or. 2001), the plaintiff was threatened with a loss of benefits when her caseworker initiated termination proceedings after the plaintiff failed to timely submit re-certification paperwork. The decision to terminate benefits was made and the plaintiff was informed of the impending loss of benefits. An actual loss of benefits never occurred, however, because the termination was rescinded after the plaintiff submitted necessary paperwork. The court wrote:

> If plaintiff had actually been denied housing assistance benefits while her hearing was pending, the result here might well be different. However, where she never suffered a denial of benefits, she cannot successfully maintain a claim under the Fair Housing Act, the Americans with Disabilities Act, or the Rehabilitation Act.

147 F. Supp. 2d at 1048. HAP argues that the circumstances of this case are analogous to *Adam* because, despite being evicted from the rental property, Strappini has never been denied access to benefits under the voucher program.

Strappini argues that the holding in *Adam* does not apply here because HAP's actions amounted to a constructive denial of benefits for a period of ten months between January and October 2008. As a result of HAP's discriminatory treatment, Strappini was evicted from her home. Strappini's HAP file contained a notation that read "fraud; no transfer." Strappini contends that this notation in her file, coupled with her eviction, prevented her from availing herself of the benefits of the voucher program for over ten months. Instead, Strappini maintains, she was continually turned away from qualifying housing and was only able to obtain housing with funds from other charities and out of her own pocket, funds which are scarce at best.

HAP's argument misses the basis of Strappini's discrimination claims, which are premised primarily on HAP's failure to provide her reasonable accommodation. In order to have an equal

opportunity to use and enjoy her dwelling, Strappini required approval to allow an additional person to reside in her apartment. This accommodation was reasonably necessary to permit her the assistance she needed and not run afoul of the lease agreement which restricted the tenancy to one person. Strappini contends that HAP failed to accommodate her when it frustrated her efforts to get a live-in aide approved; refused to engage in the interactive process or otherwise assist her when she faced eviction; and tainted her residential record by initiating a fraud investigation, recommending termination, preventing a transfer, and maintaining a file which indicated that she had committed fraudulent activity.

The court agrees that there is at least a genuine issue of material fact as to whether HAP failed to accommodate Strappini's needs and, in so failing, denied her an equal opportunity to use and enjoy her residence. HAP does not address Strappini's contention that she was constructively denied benefits as a result of HAP's allegedly discriminatory actions. The court agrees that a reasonable fact-finder could conclude that, in frustrating Strappini's attempts to receive accommodation, HAP interfered with Strappini's ability to benefit from the voucher program. The court also agrees that, to the extent that HAP's failure to accommodate contributed to Strappini's eventual eviction, a jury reasonably could find that HAP constructively denied Strappini's benefits under the voucher program. There is at least a genuine issue of material fact that Strappini has suffered a denial of benefits arising from the actions of HAP. The record supports a reasonable inference that, not only was Strappini evicted from her existing residence, she has since had considerable difficulty finding voucher-eligible housing that would admit her as a resident due to the fraud investigation and eviction. For these reasons, HAP's motion for summary judgment on the discrimination claims should be denied.

B.    *Defamation*

"To establish a claim for defamation, a plaintiff generally must show harm resulting from defendant's publication to a third party of a defamatory, false statement of and concerning the plaintiff." *Morlan v. Qwest Dex, Inc.*, 332 F. Supp. 2d 1356, 1361 (D. Or. Aug. 25, 2004) (citing *Wallulis v. Dymowski*, 323 Or. 337, 342-43, 918 P.2d 755 (1996))). "Truth is a complete defense to a defamation claim[,]" and publication occurs when the statement is communicated to a third party. *Quimby v. Bank of America*, 2009 U.S. Dist. LEXIS 98575, at *19 (D. Or. Sept. 21, 2009) (citing *Bahr v. Statesman Journal*, 51 Or. App. 177, 180, 624 P.2d 664 (1981) and *Wallulis v. Dymowski*, 323 Or. 337, 343, 918 P.2d 755 (1996) (en banc)). Here, Strappini alleges that HAP defamed her when it indicated in her file that she had been the subject of a fraud investigation and had been evicted from a voucher-eligible property.

HAP argues that Strappini cannot sustain her burden on summary judgment because she cannot establish that the document containing the allegedly defamatory statement was distributed to anyone outside of the agency itself and, thus, the statement was not published. Strappini responds that she has both direct and circumstantial evidence of publication by HAP. Strappini first argues that HAP published its defamatory statement when it informed Sideras that it was conducting a fraud investigation of Strappini. Strappini also cites, as circumstantial evidence, the fact that she was rejected by every eligible housing provider listed in HAP's Affordable Housing Portfolio and was told repeatedly that she was turned down because of her prior difficulties with HAP. Strappini argues that the court should infer, pursuant to the standard on motions for summary judgment, that these third-party landlords were informed of the defamatory statement in the course of screening Strappini as a potential resident and, therefore, there is a genuine issue of fact as to whether HAP

published a defamatory statement about her.

The court agrees with Strappini.  Strappini has produced evidence that she attempted to secure housing from the housing providers affiliated with HAP and was turned down in every instance.  On some of these occasions, the housing provider informed Strappini, expressly, that it was because of HAP's fraud investigation, the "no transfer" designation, Strappini's difficulties with HAP, or other reasons that could have originated only from Strappini's HAP file or the disclosure of the contents of that file.  On the record before it, the evidence reasonably gives rise to an inference that the contents of Strappini's HAP file were communicated to other Section 8 eligible housing providers.  Accordingly, summary judgment on this claim should be denied.

II.    The Siderases' Motion for Summary Judgment

The Siderases argue that they are entitled to summary judgment on four grounds:  first, the ADA claim fails because Strappini lacks standing and because the rental property does not qualify as a place of public accommodation; second, the disability discrimination claims are subject to issue preclusion; third, the retaliatory eviction claims fail because the Siderases have a legitimate, non-discriminatory reason for the eviction; and, fourth, the defamation claim fails for lack of proof of a defamatory statement and the doctrine of qualified privilege.

A.    *Discrimination Claims*

The Siderases argue that Strappini's ADA claim against them fails for two reason: (1) Strappini lacks standing because she cannot establish an injury that is redressable under Title III of the ADA and (2) the Siderases's property is not a place of public accommodation and, thus, does not fall under the protections of the ADA.  In her responsive briefing, Strappini concedes that summary judgment is appropriate on this claim as the Siderases's rental property does not qualify as a place

FINDINGS AND RECOMMENDATION        17                        {KPR}

of "public accommodation" under Title III of the ADA. Therefore, summary judgment on this claim should be granted.

B.      Issue Preclusion

The Siderases move for summary judgment on the remaining disability claims as barred by the doctrine of collateral estoppel, also known as issue preclusion.[4] They argue that the prior proceeding before the FED panel[5] has a preclusive effect on Strappini's discrimination claims because she raised disability discrimination as a defense and that defense was rejected. Strappini argues that the Siderases cannot establish that the issue in the prior proceeding was identical or actually litigated. Furthermore, Strappini asserts that she was not given a full and fair opportunity to present her position and the prior proceeding was not the type of proceeding that has a preclusive effect. And, Strappini notes, the Siderases seek summary judgment of these claims on only these grounds.

Issue preclusion arises when an issue of ultimate fact has been determined in a prior proceeding. *Nelson v. Emerald People's Util. Dist.*, 318 Or. 99, 102-103, 862 P.2d 1293 (1994). The premise of issue preclusion is that if "one tribunal has decided an issue, the decision on that issue may preclude relitigation of the issue in another proceeding." *Fisher Broadcasting v. Department of Revenue*, 321 Or. 341, 347, 898 P.2d 1333 (1995). In *Nelson*, the Oregon Supreme Court set forth an issue preclusion test with five requirements:

1. The issue in the two proceedings is identical[;]

---

[4]As Strappini points out, Oregon courts have opted to refer to this doctrine as "issue preclusion" and the court will follow suit.

[5] In evaluating issue preclusion in this matter, the court takes no position on the ultimate admissibility, in this court, of evidence presented at the FED trial.

2. The issue was actually litigated and was essential to a final
decision on the merits in the prior proceeding[;]
3. The party sought to be precluded has had a full and fair opportunity
to be heard on that issue[;]
4. The party sought to be precluded was a party or was in privity with
a party to the prior proceeding[; and]
5. The prior proceeding was the type of proceeding to which this
court will give preclusive effect.

*Nelson*, 318 Or. at 104 (citations omitted). Oregon law imposes a "strict standard for the 'identity

of issues' requirement and require[s] that 'the precise question was raised and determined in the

former suit.'" *Enquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1007 (9th Cir. 2007) (quoting *State v.*

*Hunt*, 161 Or. App. 338, 985 P.2d 832 (1999)).

The Siderases argue that issue preclusion is appropriate for several reasons. First, the FED

action already decided that Ian did not qualify as a live-in aide, was not a lawful resident, and, thus,

the eviction notice was valid. Second, Strappini presented her disability discrimination claim at the

FED trial. The FED court was required to address the issue and did so, deciding that the 2003

Request for Accommodation was not sufficient to establish discrimination based on disability.

Third, the failure of the discrimination defense was essential to the FED judgment because, again,

the FED court was obligated to consider it, did so, and rejected it. Fourth, FED judgments

appropriately may be given preclusive effect. Finally, defenses raised in a prior action also are given

preclusive effect.

Strappini argues that the disability discrimination claims are not precluded by the FED

hearing and judgment. First, the issues in this case are broader than the narrow issues addressed at

the FED hearing. The FED referee explicitly stated that the issue presented was of the validity of

the eviction notice. Second, the issues of disability and discrimination were not actually litigated.

FINDINGS AND RECOMMENDATION       19                               {KPR}

In fact, the FED referee stopped Strappini from presenting evidence and analysis on this issue and directed her to focus on the validity of the eviction notice. Because the record does not include findings or conclusions on the issues of disability and discrimination, the hearing should not have preclusive effect on those issues. Furthermore, the FED referee explicitly declined to issue findings and a ruling, instead focusing exclusively on the contractual issue and finding, at most, that Ian did not have legal authority to reside at the rental property. Third, the resolution of the disability discrimination claims was not essential to the FED judgment. There is no evidence that the disability discrimination claims had any effect on the FED determination, one that was premised solely on whether Ian's presence was authorized and the eviction notice valid. Fourth, the FED hearing did not allow Strappini to present the necessary evidence and argumentation to fully litigate her disability discrimination claims. FED hearings are typically very short and focus on a narrow issue. Strappini was not represented by counsel, there was no discovery of evidence, and the transcript reveals that no meaningful litigation took place. Finally, although FED hearings may be given preclusive effect, they are not given preclusive effect where they were insufficient to address the issues in question.

The FED hearing transcript demonstrates the minimal extent to which the disability discrimination claims were actually litigated. First, despite the fact there are several references to Strappini's disabilities, the transcript does not reveal a meaningful discussion regarding whether those disabilities gave rise to discrimination by the Siderases. Second, the FED referee explicitly stated: "The only thing that I'm addressing today is this 30-day notice to vacate with cause, and whether it's a valid notice." (Smith Aff., Ex. 15 at 7.) Both the referee and counsel for the Siderases stated that the issue of Strappini's disability was not disputed for purposes of the FED hearing. Third, the referee concluded the hearing by referencing the contractual nature of the agreement

between Strappini and HAP, noting that it was "not the same as the HUD law and federal law as far as reasonable accommodation is concerned[.]" (Smith Aff., Ex. 15 at 17.) The referee went on to state: "I'm not going to listen to this anymore because I feel that this is irresponsible of me to continue." (Smith Aff., Ex. 15 at 17.) Overall, the transcript demonstrates that while the issues of disability and potential discrimination were referred to at the FED hearing, they were not discussed, let alone actually litigated, in a meaningful way. Accordingly, under the circumstances in this case, issue preclusion cannot be applied against Strappini's disability discrimination claims.

C.      *Retaliatory Eviction Claims – ORS 659A.145 and ORS 90.385*

The essence of the Siderases' argument for summary judgment on this claim is that the FED referee's finding that the eviction notice was valid precludes the court from finding that the Siderases's legitimate, non-discriminatory reason for eviction was actually pretextual. As above, the FED court's findings were limited to the facial validity of the eviction notice. The technical validity of the eviction notice does not preclude a finding that the reason given for issuing the notice, i.e., that Strappini was sharing her apartment with an unauthorized resident, was in fact pretextual and obscured a discriminatory motive. Thus, the Siderases are not entitled to summary judgment and on the retaliatory eviction claims and the motion with respect to these claims should be denied.

D.      *Defamation*

As a threshold matter, Strappini concedes that the defamation claim against Albina Sideras should be dismissed. Thus, the ensuing discussion refers only to Sideras. Sideras argues that the defamation claim against him should be dismissed on summary judgment because, first, Strappini cannot show that he communicated a defamatory statement to HAP and, second, because his communications with HAP are immune from liability under the doctrine of qualified privilege.

i.      Qualified Privilege

To the extent that Sideras's statement is subject to qualified privilege, Sideras is immune from suit and further analysis of the defamation claim is unnecessary. Accordingly, the court will first address the issue of qualified privilege.

Under Oregon law, statements that are entitled to qualified privilege fall into three categories: (1) statements "made to protect the interests of defendants"; (2) statements "made to protect the interests of plaintiff's employer"; and (3) statements "on a subject of mutual concern to defendant and the person to whom the statement was made." *Kofoed v. Shiprack*, Civil No. 04-558-AA, 2004 U.S. Dist. LEXIS 22909, (D. Or. Nov. 2, 2004) (citing *Wattenburg v. United Medical Laboratories, Inc.*, 269 Or. 377, 380, 525 P.2d 113 (1974)). The privilege is qualified and the plaintiff may rebut the privilege if the plaintiff "prove[s] that the defendant abused the 'privileged occasion.'" *DeLong v. Yu Enterprises, Inc.*, 334 Or. 166, 170 (2002) (quoting *Wallulis v. Dymowski*, 323 Or. 337, 348, 918 P.2d 755 (1996). Thus, upon a finding that the statement is entitled to such privilege, a plaintiff may remove the privilege by proving, in the case of defamation, "that the individual making the defamatory statement either lacked objectively reasonable grounds for the statement or did not, in fact, believe the statement to be true." *Muresan v. Philadelphia Romanian Pentecostal Church*, 154 Or. App. 465, , 962 P.2d 711 (1998) (citing *Walsh v. Consolidated Freightways*, 278 Or. 347, 356-57, 563 P.2d 1205 (1977)).

Sideras argues that statements he made to HAP qualify as statements made both to protect Sideras (the first category) and those on a subject of mutual concern to both himself and HAP (the third category). Sideras argues that he had an interest in information relating to a person residing in his rental property and that both he and HAP had an interest in the details of Strappini's tenancy,

as they both held rental contracts with Strappini. Furthermore, Sideras argues, he had a contractual relationship with HAP in conjunction with Strappini's tenancy, which demonstrates an additional layer to their "mutual concern." Strappini responds that, even if Sideras can establish that his statement falls under one of the three categories of statements entitled to qualified immunity from defamation, she has presented evidence that Sideras's statement was made in bad faith.

The court agrees that there is sufficient evidence in the record to create a genuine issue of material fact as to whether Sideras's defamatory statements were made in bad faith or with malicious intent. Strappini previously sued the Siderases for a variety of offenses, including disability discrimination, which suit resulted in a cash settlement paid by the Siderases. The lawsuit directly attacked Sideras's management of the property that is the subject of his contract with HAP and that he violated a tenant's civil rights by his management. Strappini claims that, subsequent to the settlement, the Siderases engaged in harassment of Strappini including allegations of non-payment of rent, rejection of timely rent payments, and threats of eviction. Strappini emphasizes that Sideras admitted at deposition that he knew that such report to HAP would initiate a fraud investigation against Strappini. Taken together, the evidence creates a genuine issue of material fact as to Sideras's motive and, thus, qualified immunity does not apply.

### ii.   Prima Facie

As set forth above, defamation occurs where a false and defamatory statement is communicated to a third party. Strappini premises her defamation claim on the theory that, when Sideras falsely reported that she had an unauthorized person residing in her apartment, he knew that HAP would initiate a fraud investigation. This, in turn, caused HAP to put the notation of "fraud" in Strappini's HAP file, which this court has determined was subsequently published to third parties.

Sideras argues that the allegation of fraud originated within HAP and was not the product of an accusation made by Sideras.

The parties dispute whether the statement made by Sideras to HAP was defamatory. Sideras argues that his statements were not defamatory because he never couched them in the context of fraud and an allegation of housing an unauthorized guest is not itself defamatory. Sideras does not provide analysis as to why such a statement should not be considered defamatory. Strappini argues that, even if Sideras did not refer to her conduct as fraudulent, his statements had the same effect.

A court may rule on "whether a statement is capable of a defamatory meaning as a matter of law." *Knievel v. ESPN*, 393 F.3d 1068, 1073 (9th Cir. 1993). The Ninth Circuit explained: "When evaluating the threshold question of whether a statement is reasonably capable of sustaining a defamatory meaning, we must interpret that statement 'from the standpoint of the average reader, judging the statement not in isolation, but within the context in which it is made.'" *Id.* at 1074 (quoting *Norse v. Henry Holt & Co.*, 991 F.2d 563, 567 (9th Cir. 1993) (citation omitted)). That said, "[t]he existence of a defamatory meaning is generally a question of fact for the jury." *Church of Scientology v. Flynn*, 744 F.2d 694, 696 (9th Cir. 1984).

Under Oregon law, "[a] defamatory communication is one that would subject another to . . . hatred, contempt or ridicule . . . [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other]." *Quimby v. Bank of America*, 2009 U.S. Dist. LEXIS 98575, *18-19 (D. Or. Sept. 21, 2009) (citing *Reesman v. Highfill*, 327 Or 597, 603, 965 P2d 1030, 1034 (1998) (internal quotation marks and citations omitted)). Here, Strappini contends that Sideras's statements to HAP resulted in her being investigated for fraud and, ultimately, seriously interfered with her

FINDINGS AND RECOMMENDATION        24        {KPR}

ability to use and enjoy her housing benefits. Furthermore, an allegation of fraud, in and of itself, is a serious allegation and one that is capable of defamatory meaning. Thus, whether under the facts of this case it was a defamatory statement is a question for the jury.

Finally, Sideras's argument does not address the other elements of a defamation claim. On the record before it, the court concludes that there is a genuine issue of material fact as to the remaining elements of defamation, specifically falsity, publication, and damages. Sideras's motion for summary judgment on the defamation claim should be denied.

### Conclusion

For the reasons above stated, the court should grant the Siderases' motion for summary judgment as to the ADA claim, in its entirety, and the defamation claim as it relates to Albina Sideras. The court should deny the remainder of the Siderases' motion for summary judgment. The court should deny HAP's motion for summary judgment in its entirety.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due January 27 , 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 13th day of January, 2011.

JOHN V. ACOSTA
United States Magistrate Judge